**For Publication**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

———————————————————

FLORENCE BLOCK,

                                Plaintiff,

    v.

SENECA MORTGAGE SERVICING;
OCWEN LOAN SERVICING, LLC;
FAY SERVICING LLC; ARLP
SECURITIZATION TRUST, SERIES
2015-1. JOHN DOES I-X;

                              Defendants.

———————————————————

Civil Action No. 16-0449 (FLW)(LHG)

**OPINION**

**Hon. Freda L. Wolfson, U.S.D.J.:**

       Before the Court are the motions of Defendants Seneca Mortgage Servicing, Ocwen Loan Servicing, Fay Servicing, and ARLP Securitization Trust to dismiss the complaint of Plaintiff Florence Block, alleging breach of contract and violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601–2617, and the New Jersey Consumer Fraud Act ("NJCFA") as the result of Defendants' handling of Plaintiff's mortgage modification. For the reasons set forth below, Defendants' motions are granted in part and denied in part as follows: All of Defendants' motions to dismiss Count I, Plaintiff's breach of contract claim, are denied; Defendant Ocwen's motion to dismiss Count II, Plaintiff's FDCPA claim, is granted in part and denied in part (granted as to Plaintiff's claim under 15 U.S.C. § 1692d, granted as to Plaintiff's claim under 15 U.S.C. § 1692e based upon the February 2013 telephone call with Ocwen's employee, granted on the basis of the statute of limitations for any conduct prior to January 26, 2015, and denied as to all other claims); Defendant Fay's motion to dismiss Count II, Plaintiff's FDCPA claim is

granted (with prejudice as to Plaintiffs 15 U.S.C. § 1692c(a) claim, without prejudice with respect to all other claims); Plaintiff is given leave to amend the complaint to address the status of Plaintiff's default at the time servicing responsibilities for her mortgage were transferred from Ocwen to Fay; Defendant Fay's motion to dismiss Count III, Plaintiff's RESPA claim, is granted; Defendant Seneca's motion to dismiss Count IV, Plaintiff's NJCFA claim, is denied.

## FACTUAL BACKGROUND & PROCEDURAL HISTORY

Unless otherwise identified as originating from another source, the facts alleged in the complaint are as follows. Plaintiff purchased the real property located at 40 Constitution Way, Bernards, New Jersey in 1997. Compl. ¶ 8. On or about May 22, 2007, Plaintiff entered into a refinance mortgage loan transaction. *Id.* at ¶ 10. As part of the refinance, Plaintiff executed a promissory note payable to the order of EquiFirst Corporation in the amount of $580,500.00 and a mortgage to secure the promissory note. *Id.* at ¶ 11. As has become de rigueur in the mortgage industry, since origination, Plaintiff's loan has been sold multiple times and the servicing rights of the loan have been transferred several times.[1] *Id.* at ¶ 15. Plaintiff defaulted on her mortgage loan obligation in 2010. *Id.* at ¶ 16.

On January 4, 2013, the law firm of Pluese, Becker & Saltzman, LLC filed a debt collection foreclosure action in New Jersey Superior Court on behalf of The Bank of New York

---

[1] The servicing rights and beneficial ownership interest in a given mortgage note are legally distinct and can be and often are transferred separately. The ownership interest is originally held by the mortgage lender who loaned the money to purchase the property and can be sold by the lender thereafter. Servicing rights encompass the day-to-day administration of the loan and typically include the processing of loan payments, responding to borrower inquiries, keeping track of the principal and interest balance on the loan, managing the loan's escrow account, and initiating foreclosure actions. Servicing rights are initially assigned to an entity at the time the mortgage is originated and may be assigned to other entities thereafter. *See* Consumer Financial Protection Bureau, "What's the difference between a mortgage lender and a servicer?" available at http://www.consumerfinance.gov/askcfpb/198/whats-the-difference-between-a-mortgage-lender-and-a-servicer.html.

Mellon Trust Company seeking to enforce Plaintiff's promissory note.[2] *Id.* at ¶ 18. After the foreclosure litigation had been filed, servicing of the mortgage loan transferred to Defendant Seneca.[3] *Id.* at ¶ 19.

On or about May 12, 2014, Seneca provided Plaintiff a "Trial Modification Agreement" ("TMA").[4] *Id.* at ¶ 20. The relevant provisions of the TMA are as follows:

Section 1:

. . . In consideration of the mutual promises in this Agreement the receipt and sufficiency of which is hereby acknowledged, you and we agree as follows, notwithstanding anything to the contrary contained in the Note or Mortgage evidencing your Loan:

1. You [Plaintiff] acknowledge that default occurred and your loan has been properly accelerated and is fully due and payable.
2. You further acknowledge that a mortgage foreclosure proceeding was properly brought against you and your property as a result of your default.
3. You and we [Defendant Seneca] agree that your Loan will be reviewed for a permanent modification if the following payments are made, in certified funds:

   A deposit in the amount of $ 4,887.73 to be made immediately.

   Six trial monthly payments of $ 4,609.31 each, beginning 6-01-14, and the same day of each month after that as detailed on the attached Trial Payment Schedule.[5]

---

[2] Although not explicitly alleged in the complaint, it appears from the attached exhibits that Bank of New York Mellon was the owner of Plaintiff's loan, by at least January 2013.

[3] It is unclear from the allegations in the complaint whether the original creditor or another servicer was responsible for servicing the loan prior to Seneca, but for the purposes of the present motions to dismiss, it is sufficient to observe that Plaintiff has alleged that Seneca took over the servicing of Plaintiff's mortgage sometime after January 4, 2013.

[4] When deciding a motion to dismiss, a court may consider the pleadings and attached exhibits "which [are] a part of the pleading for all purposes," Fed. R. Civ. P. 10(c); *Dowdell v. University of Med. & Dentistry,* 94 F. Supp. 2d 527, 529 (D.N.J. 2000) (citations omitted). *See also* 2 Moore's Federal Practice § 12.34[2] (3d ed. 2014) (""court may consider only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which the judge may take judicial notice."). The Trial Modification Agreement provided to Plaintiff by Seneca is attached to the complaint as Exhibit A. The Court considers the text of the Trial Modification Agreement as a document attached to the pleadings.

[5] The Trial Payment Schedule, attached as Section 3 of the TMA, provides:
You agree to make payments under your trial modification plan, as follows: AMOUNT AND DATE PAYMENT MUST BE RECEIVED:
   Trial Payment Schedule
   Down Payment Amount: $ 4,887.73

Your trial monthly payments include principal, interest at a fixed rate of 6%, and escrow. That portion of your trial monthly payment used to pay escrow (the \\Escrow Payment") includes payments to cover taxes, insurance premiums, assessments and other escrow items.

…

Once you timely complete this payment schedule, you will be reviewed for a permanent modification. However, there is no guarantee that we will agree to permanently modify your Loan even if you make all trial payments, and even *if* you continue to make other payments. Acceptance by SMS or any of its agents, employees or other representatives of any payment or partial payment, including any trial modification payments, shall not be construed as a waiver of your default under the Loan unless and until SMA agrees to permanently modify your Loan and the permanent modification agreement is fully executed by all parties. A payment will be considered to be "timely" if we receive it before the date we can charge you a late charge as provided in the note evidencing your Loan.[6]

Section 2:

You will qualify for a permanent modification at the end of the trial period if (1) you timely make all trial payments; and (2) we conclude, after review, that there has not been a material adverse change in your financial status or any other change in circumstances that render you ineligible for a permanent modification. We will endeavor to complete our review and implement any permanent modification to which you may be entitled as soon as reasonably possible.

If you qualify for a permanent modification at the end of the trial period, your permanent modification will be as follows:

---

      Down Payment Due Date: 5-15-14
      Trial Plan Monthly Payment: $4,609.31
      Term of Trial Plan: 6-01-14 — 11-01-14

[6] "As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings. . . . However, an exception to the general rule is that a "document *integral to or explicitly relied* upon in the complaint" may be considered "without converting the motion [to dismiss] into one for summary judgment." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). *See also In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 368 (3d Cir. 1993) (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir. 1993) ("a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.")). Under the terms of the original adjustable rate mortgage note, provided to the Court by Defendant Fay and incorporated into the complaint by reference, Plaintiff's loan servicers were permitted to charge a late fee on "any monthly payment" not received "by the end of 15 calendar days after the date it is due." Adjustable Rate Note Section 7(A).

Your monthly installments of principal and interest will be $ 3,770.57, starting on 6-01-14, and the same day each month after that. You will additionally have to make an Escrow Payment. We will provide you with notice of the amount of your Escrow Payment. Your current Escrow Payment is $838.74. If your Escrow Payment remains the same when your permanent modification becomes effective, then your total monthly payment for principal and interest, plus your Escrow Payment, would be $4,609.31. However, your actual total monthly payment may vary depending on the actual amount of your Escrow Payment

If your Loan is permanently modified, the interest rate on your Loan will be fixed at 6% for the life of the Loan.

*As* of the date of this Agreement, the total amount necessary to pay off your Loan is $801,809.66. Your modified monthly payment was calculated by applying your interest rate to an adjusted principal balance of $650,000.00. If your loan is permanently modified, we will capitalize the other past due amounts of $138,491.27. This "balloon payment" of $138,491.27 will remain owed but will be deferred until maturity or payoff of the Loan.

4.  We agree to suspend taking further action in your foreclosure proceeding, including any scheduled foreclosure sale, so long as you meet all obligations under this Agreement, including the obligation to make timely payments. You agree that our suspension of foreclosure proceeding will not affect any of our rights to continue our foreclosure proceeding against you and your property and will not be deemed to be a waiver of our rights to continue our foreclosure proceeding if you do not timely make all payments required by this Agreement, or if we otherwise determine that you do not qualify for a permanent modification. You further agree that your Loan was properly accelerated and that you received proper notice of acceleration, including pursuant to a Notice of Intention to Foreclose dated May 24, 2012. Moreover, you agree that no new notice of default, notice of intent to accelerate, notice of acceleration, or similar notice will be necessary to continue the foreclosure action, and all rights to such notices are hereby waived to the extent permitted by applicable law. You also waive any right to mediation, conciliation or arbitration in the foreclosure proceeding to the extent permitted by applicable law.

…

8.  If you fail to meet all of your obligations under this Agreement, including timely making the deposit and your trial payments:

>   Your Loan will remain in default and your Loan will be governed by the Note and Mortgage evidencing your Loan as If this Agreement had not been entered Into.

>   You will be deemed to have waived any statute of limitations related to acceleration of your Loan.

> We will have the right to continue the foreclosure proceeding of the Mortgage securing your Loan, without further notice to you, except as required by applicable law. You waive all claims and defenses of any kind that you might allege in the foreclosure proceeding, whether related to the origination of your Loan, your payments on the Loan1 your default, the right to bring the foreclosure proceeding or otherwise.

Compl. Ex. A. The copy of the TMA was signed by Plaintiff on June 16, 2014. It is not signed by Defendant Seneca, although there is a signature line available, above which is printed "Seneca Mortgage Servicing, LLC, Asset Manager." *Id.*

Plaintiff alleges that at some point after she received the TMA, Seneca agreed to change the due dates under the TMA so that an initial deposit would be due in the middle of June 2014 and the six monthly payments would be due commencing on June 15, 2014. Compl. ¶ 24.

On or about June 15, 2014, Plaintiff made an initial deposit in the amount of $4,887.73 to Seneca. *Id.* at ¶ 25. Plaintiff has attached a copy of a PNC Bank personal check from Plaintiff made payable to the order of Seneca Mortgage Servicing in the amount of $4,887.73 and dated June 15, 2014. Compl. Ex. A. On June 15, 2014, Plaintiff also conveyed a check in the amount of $4,609.31 to Seneca as the first payment under the TMA. Compl. ¶ 26.  Plaintiff has attached a copy of the check, dated June 15, 2014. Compl. Ex. A.

According to Plaintiff's bank statement, attached to the Complaint, the initial down payment check and the first monthly payment check were paid on June 25, 2014. It is not clear from the Complaint or the attached documents whether this reflects the date on which the checks were conveyed, or more likely, merely the date on which Defendant Seneca deposited Plaintiff's checks.

Plaintiff made subsequent payments in the amount of $4,609.31 to Seneca for the months of July, August, September, October, and November 2014, pursuant to the Trial Modification

Agreement. *Id.* at ¶ 27. Plaintiff has attached to the complaint, checks made out to Seneca, dated July 15, 2014; August 15, 2014; September 15, 2014; and October 15, 2014. Compl. Ex. A.

Seneca deposited all of Plaintiff's payments, totaling $32,543.59 during the trial modification period. *Id.* at ¶ 28. As alleged in the Complaint, therefore, Plaintiff had fully performed under the Trial Modification Agreement by November 15, 2014.

On or about December 1, 2014, Plaintiff's mortgage loan was sold and servicing of the loan transferred to Defendant Ocwen. *Id.* at ¶ 32. Seneca did not review Plaintiff for a permanent modification prior to the transfer of loan servicing to Ocwen. Plaintiff also alleges that Seneca did not send a notice of the servicing transfer from Seneca to Ocwen.

The foreclosure action in New Jersey Superior Court was scheduled to go to trial on December 15, 2014. *Id.* at ¶ 34. On December 4, 2014, however, Pluese, Becker & Saltzman, LLC, again on behalf of its client the Bank of New York Mellon, together with Plaintiff, wrote to the state court, submitting a joint request for an adjournment of the trial. The letter stated:

> Please accept this joint request for a sixty day adjournment of the trial in the above referenced matter.
> The Defendant has completed all six of her trial modification payments and is going to be reviewed for a permanent modification, however, the Defendant's loan has been sold and the servicing transferred to a new servicer effective December 1, 2014.
> We respectfully request this adjournment to give the Defendant and the servicer additional time for the modification review process.

*Id.* at ¶ 35. The state court denied the parties' request. *Id.* at ¶ 36.

On December 17, 2014, the parties to the foreclosure action submitted a stipulation of dismissal, providing that:

1. This matter is hereby dismissed without prejudice, and subject to the right of the Plaintiff to reinstate the matter pursuant to paragraph two.
2. The Plaintiff shall have the right to reinstate this matter, within the next sixty (60) days, upon filing a certification with this Court that any of the following events have occurred: the Defendant, Florence Block, was presented with a permanent modification and rejected the permanent modification; the Defendant, Florence Block, has been reviewed

> for a permanent modification and has been denied due to a change in her financial status since the implementation of the Trial Payment Plan; or the Defendant, Florence Block, fails to abide by the terms of any Permanent Modification presented to her.

*Id.* at ¶ 37; Ex. C. The foreclosure action was not refiled. As of the date of the filing of the Complaint, there was no active foreclosure litigation involving Plaintiff's mortgage. On December 20, 2014, Defendant Ocwen sent Plaintiff a delinquency notice letter. The letter stated that Plaintiff's account first became delinquent on March 2, 2011, and that Plaintiff had failed to make payments in July, August, September, October, November, and December of 2014. Compl. ¶ 39.

Plaintiff contacted Ocwen in response to the letter and was provided with the contact information for Ocwen employee Adarsh[7], identification number 5048. Compl. ¶ 40. Plaintiff then contacted Ocwen and was told that Ocwen would not convert the TMA into a permanent loan modification. *Id.* at ¶41. It is unclear from the Complaint whether this refusal was conveyed by Adarsh or some other Ocwen employee. Counsel for Plaintiff then provided Ocwen with proof of Plaintiff's full compliance with the Trial Modification Agreement entered into with Seneca. *Id.* at ¶42.

On or about February 6, 2015, Ocwen representative Adarsh confirmed by phone with Plaintiff's Counsel, that Ocwen would send documentation to permanently modify the mortgage loan. *Id.* at ¶ 43. Ocwen never sent a permanent loan modification contract to Plaintiff. *Id.* at ¶44.

By letter dated March 4, 2015, Ocwen advised Plaintiff that servicing of the mortgage loan was being transferred to Fay Servicing, LLC, effective March 20, 2015. *Id.* at ¶ 45. By letter dated July 28, 2015, Fay Servicing notified Plaintiff that on June 29, 2015 the mortgage loan had been sold to ARLP SECURITIZATION TRUST, SERIES 2015-1. ARLP SECURITIZATION

---

[7] Adarsh's last name is not alleged.

TRUST, SERIES 2015-1 remains the owner of the loan as of the date of the filing of the complaint. *Id.* at ¶ 46. At some point after receiving the transfer notice from Ocwen, Plaintiff contacted Defendant Fay and Fay refused to provide Plaintiff with a permanent loan modification. *Id.* at ¶ 47.

Instead, in July 2015, Fay Servicing, LLC provided Plaintiff with a new Trial Loan Modification that required Plaintiff to make a down payment and six subsequent trial payments. *Id.* at ¶ 48. Plaintiff did not make additional "trial payments" and again requested that a permanent modification be provided pursuant to the Trial Modification Agreement with Seneca. *Id.* at ¶ 49.

Plaintiff sent Defendant Fay a letter dated July 27, 2015, in which Plaintiff requested information, including the servicing file on her loan, the identity of the current and past owners of her loan, and an accounting of all payments received and credited against her account. *Id.* at ¶ 88; Ex. F. The letter also set forth what purported to be a notice of error, informing Fay of the existence of the trial modification with Seneca and alleging that Seneca and Ocwen failed to properly credit Plaintiff's $32,543.59 in trial modification payments to her loan balance. *Id.* Lastly, the letter requested that all future communication from Fay be directed to Plaintiff's attorney. *Id.*

In a letter dated July 28, 2015, Defendant Fay notified Plaintiff that her mortgage loan had been sold to defendant ARLP on June 29, 2015. *Id.* at ¶ 46. In a separate letter dated September 11, 2015, Fay responded to Plaintiff's requests for information. *Id.* at ¶ 92.  Fay did not respond to Plaintiff's purported notice of error. *Id.* at ¶ 93.

Plaintiff filed the four count complaint in this case on January 26, 2016. In Count I Plaintiff claims breach of contract against Seneca, Ocwen, Fay, and ARLP for the failure to

consider Plaintiff for a permanent mortgage loan modification pursuant to the terms of the TMA, and for failure to provide a permanent mortgage loan modification pursuant to the terms of the TMA. In Count II, Plaintiff claims that Ocwen and Fay violated the Fair Debt Collection Practices Act ("FDCPA") in their servicing of Plaintiff's loan. In Count III, Plaintiff claims that Fay violated the Real Estate Settlement Procedures Act in failing to acknowledge and respond to Plaintiff's purported notice of error. In Count IV, Plaintiff alleges that Seneca violated the New Jersey Consumer Fraud Act by failing to consider Plaintiff for and to provide a permanent mortgage loan modification pursuant to the terms of the TMA.

Defendants Ocwen, ARLP, and Fay moved to dismiss the complaint on March 31, 2016. Defendant Seneca moved to dismiss the complaint on April 1, 2016. All four defendants have also joined in one another's motions.

**STANDARD OF REVIEW**

In reviewing a motion to dismiss on the pleadings, the court "accept[s] all factual allegations as true, construe[s] the complaint in the light most favorable to the plaintiff, and determine[s] whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 233 (3d Cir. 2008) (citation and quotations omitted). As such, a motion to dismiss for failure to state a claim upon which relief can be granted does not attack the merits of the action but merely tests the legal sufficiency of the complaint. *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210 (3d Cir. 2009); *see also* Fed. R. Civ. P. 8(a)(2) ("[a] pleading that states a claim for relief ... must contain a short and plain statement of the claim showing the pleader is entitled to relief"). In other words, to survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss for failure to state a claim, "a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).

However, "the tenet that a court must accept as true all the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly,* 550 U.S. at 555). A plaintiff must show that there is "more than a sheer possibility that the defendant has act unlawfully." *Id.* (citing *Twombly,* 550 U.S. at 556). This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009). In other words, for the plaintiff to prevail, the "complaint must do more than allege the plaintiff's entitlement to relief;" it must "'show' such an entitlement with its facts." *Fowler,* 578 F.3d at 211 (citing *Phillips,* 515 F.3d at 234–35).

The Third Circuit has cautioned, however, that *Twombly* and *Iqbal* "do not provide a panacea for defendants," rather, "they merely require that plaintiff raise a 'plausible claim for relief.' " *Covington v. Int'l Ass'n of Approved Basketball Officials,* 710 F.3d 114, 118 (3d Cir. 2013) (quoting *Iqbal,* 556 U.S. at 679). Thus, factual allegations must be more than speculative, but the pleading standard "is not akin to a 'probability requirement.' " *Id.* (quoting *Iqbal,* 556 U.S. at 678; *Twombly,* 550 U.S. at 556).

## <u>ANALYSIS</u>

### I. Count I: Breach of Contract — All Defendants

To state a claim for breach of contract under New Jersey law, a plaintiff "must allege (1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom, and (4) that the party stating the claim performed its own contractual obligations." *Frederico v.*

*Home Depot,* 507 F.3d 188, 203 (3d Cir. 2007). Defendants challenge Plaintiff's claims under all four factors.

### A.  Existence of Consideration for the Contract

Defendants first argue that the Seneca TMA is not a valid contract due to the absence of consideration. As an initial matter, looking to the contract itself, Defendants' claim is immediately undermined; the TMA on its face purports to be supported by adequate consideration. *See* TMA, Section 1, p.1 ("In consideration of the mutual promises in this Agreement the receipt and sufficiency of which is hereby acknowledged, you and we agree as follows"). Because not every contract that purports to be supported by consideration is so supported, the Court shall proceed to consider Defendants' arguments raised in their motions to dismiss.

"Consideration is a bargained-for exchange of promises or performance that may consist of an act, a forbearance, or the creation, modification, or destruction of a legal relation. In general, contracts are enforceable only if they are supported by consideration. If the consideration requirement is met, there is no additional requirement of gain or benefit to the promisor, loss or detriment to the promisee, equivalence in the values exchanged, or mutuality of obligation." *Sipko v. Koger, Inc.*, 214 N.J. 364, 380, 70 A.3d 512, 521–22 (2013) (citations omitted).

Plaintiff identifies two categories of consideration for the promises under the TMA. First, Plaintiff alleges that the down payment and modified monthly payments she sent to Seneca constituted consideration. Second, Plaintiff alleges that the legal rights she surrendered in the TMA constituted consideration.

In response, Defendants assert that the modified loan payments, as payments in satisfaction of a preexisting debt, cannot serve as new consideration for Defendant Seneca's alleged promises. *Segal v. Lynch,* 211 *N.J.* 230, 253, 48 *A.*3d 328 (2012) (stating that "consideration cannot be a promise to perform a pre-existing legal duty") (citing *Williston on Contracts* § 7:37 (4th ed.2008)). *See Bernetich, Hatzell & Pascu, LLC v. Med. Records Online, Inc.*, 445 N.J. Super. 173, 183–84, 136 A.3d 955, 961 (App. Div. 2016) ("consideration generally may not be furnished by fulfilling a pre-existing legal duty. 'Performance of a legal duty owed to a promisee which is neither doubtful nor the subject of honest dispute is not consideration....'") (quoting *Restatement (Second) of Contracts,* § 73 (1981)). In other words, Defendants argue that Plaintiff cannot have offered as consideration the payment of monies she already owed.

Neither Plaintiff nor any of the Defendants has provided the Court with controlling precedent on whether Plaintiff's modified monthly payments themselves may constitute adequate consideration for the TMA, and the Court is not persuaded by the other district court opinions briefly touching upon it. However, the Court does not need to determine the sufficiency of Plaintiff's modified loan payments as consideration because the complaint clearly alleges that Plaintiff offered other valuable consideration to secure Defendants' promises.

Specifically, under the TMA, Plaintiff surrendered valuable legal rights, including (i) acknowledging that default occurred; (ii) acknowledging that Plaintiff's loan was properly accelerated and is fully due and payable; (iii) acknowledging that a mortgage foreclosure proceeding was properly brought against Plaintiff and Plaintiff's property as a result of Plaintiff's default; (iv) agreeing that Plaintiff received proper notice of the loan acceleration; (v) agreeing that no new notice of default, notice of intent to accelerate, notice of acceleration, or similar notice would be necessary to restart the foreclosure action; (vi) waiving all rights to all

such notices to the extent permitted by law; (vii) waiving any right to mediation, conciliation or arbitration in the foreclosure proceeding to the extent permitted by law; and (viii) waiving all claims and defenses of any kind that Plaintiff might allege in the foreclosure proceeding, whether related to the origination of Plaintiff's Loan, payments on Plaintiff's Loan, Plaintiff's default, the right to bring the foreclosure proceeding, or otherwise. The Court is particularly persuaded by Plaintiff's forfeiture of defenses in the foreclosure action that was pending, in June 2014, when Plaintiff signed the TMA, giving up her legal rights as the defaulting party. As discussed below, the law is clear the Plaintiff's forfeiture of such valuable legal rights can be sufficient consideration for a new contract.

In perhaps the seminal case on TMAs, or Trial Payment Plans (TPPs) as they are also known, the Seventh Circuit in *Wigod* found that separate and apart from any monetary payments on the loan by Plaintiff, "the TPP contained sufficient consideration because, under its terms, . . . (the promisee) incurred cognizable legal detriments." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 564 (7th Cir. 2012) (alterations in original). *Wigod* was decided under the law of Illinois. "Under Illinois law, consideration consists of some detriment to the offeror, some benefit to the offeree, or some bargained-for exchange between them. 'If a debtor does something more or different in character from that which it was legally bound to do, it will constitute consideration for the promise.'" *Id.* at 563–64 (certain quotations omitted) (quoting 3 *Williston on Contracts,* § 7:27). The law of New Jersey is substantially similar, and provides a broad definition of consideration. Indeed, "[v]ery little would be needed in New Jersey to uphold a contract. In . . . [one] case, . . . the [New Jersey] Court of Errors and Appeals[, now the New Jersey Supreme Court,] said:

> The consideration to support a promise may be either a benefit accruing to the promisor or a loss or disadvantage to the promisee. (Citing New Jersey cases) The detriment to the promisee necessary to constitute a consideration is sufficient if it consists of the simple surrender of a legal right. And in fact any act which constitutes a change of the legal position of the promisee may be a valid consideration. * * * It was not necessary to the validity of the contract that the consideration should move directly to the respondent. It was sufficient if it passed to third persons at her request. * * * Nor does the matter of the adequacy or inadequacy of the consideration enter into the question of validity. That is left to the free choice and personal judgment of the parties."

*In re Cent. R. Co. of N.J.*, 163 F.2d 44, 51–52 (3d Cir. 1947) (quoting *Headley v. Leavitt*, 65 N.J.Eq. 748, 55 A. 731) (alterations in original). Here, Plaintiff's surrender of her legal rights alone is sufficient consideration for Defendants' promise under the TMA.

The Fifth Circuit's decision in *Pennington v. HSBC Bank USA, N.A.*, relied upon by Defendants, does not hold to the contrary. Defendants contend that *Pennington* stands for the proposition that a TMA is not a valid contract where the only consideration offered is the payment of a preexisting debt and the TMA itself is unsigned. This Court reads *Pennington* differently. Significantly, the decision in *Pennington* was limited to its facts. *Pennington v. HSBC Bank USA, N.A.*, 493 F. App'x 548, 553 (5th Cir. 2012) ("We need not determine whether TPPs in general are contracts, because these plaintiffs have not met the conditions set by the TPPs and Modification Agreements. Smith's allegations demonstrate her financial disqualification from the program; the bank never signed the TPP for the Penningtons or the Modification Agreement for Smith, which is required for the provisions to take effect."). The TMA, or TPP, at issue in *Pennington* had an explicit clause requiring it to be executed by the defendant servicer before it became a binding agreement. *Id.* at 554 ("The Penningtons' claim for breach of the TPP fails for an even more basic reason: Their TPP did not form a contract, because the bank never expressed an intent to be bound. The TPP expressly requires that before the contract is final, the lender must send a signed copy to the borrower. The Penningtons never

alleged that they received such a signed copy. Their contract contained the same language . . . that the TPP does not take effect until the borrower and the lender sign it and the lender provides the borrower a signed copy."). There is no similar clause here. On the contrary, the express terms of the TMA indicate that it took the form of a unilateral offer by Defendant to Plaintiff, which Plaintiff could accept by executing the agreement and performing under it.

Even were there a signature requirement under the TMA, the Court is not convinced that the absence of a signature would defeat the existence of an agreement given Defendant's subsequent course of conduct. At least one court in this District has found that it would not. *See Beals v. Bank of Am., N.A.*, No. CIV.A. 10-5427 KSH, 2011 WL 5415174, at *10 (D.N.J. Nov. 4, 2011) ("failure to sign the document is not dispositive" because "Defendant['s] decision to cash the [Plaintiff's] check[s] and remain silent . . ., without any indication that the agreement was still under review, is a sufficiently meaningful signal of an intention to be bound to state a claim for breach contract."). Here, Defendant Seneca allowed half a year to pass, in which Plaintiff is alleged to have made payments in compliance with the TMA, without Seneca ever expressing that its failure to sign the document meant that no agreement was in force.

Finally, in *Pennington*, the Fifth Circuit found that the only consideration offered by the plaintiff was the modification payments made under the TMA/TPP. That court did not consider whether the debtor had surrendered any legal rights. In contrast, I find that Plaintiff has identified ample consideration, outside of pure monetary payments, in the form of her forfeiture of legal rights.

### B.  Plaintiff's Performance Under the Contract

Defendants argue that Plaintiff cannot bring a breach of contract action because she failed to fulfill her obligations under the TMA in the first instance. Under New Jersey law, to state a claim for breach of contract, the party stating a claim must allege, *inter alia*, that it performed its

16

own contractual obligations. *Beals*, 2011 WL 5415174, at *9 (citing *Frederico,* 507 F.3d at 203). Defendants present two alleged breaches by Plaintiff. First, Plaintiff allegedly failed to make her trial payments in "certified funds," as required by the TMA. Second, Plaintiff allegedly failed to make her six trial payments in a timely manner. Specifically, Defendants contend that the down payment and five of the six trial payments were submitted late.

As to Defendants' first claim, the allegations in the Complaint assert that Defendant Seneca, and the then owner of Plaintiff's mortgage loan, the Bank of New York Mellon, clearly accepted Plaintiff's mortgage payments and made no mention at the time of any payments being late or not in certified funds. Compl. ¶¶ 25-27. Seneca is alleged to have deposited Plaintiff's down payment and all six of her trial monthly payments in the total amount of $32,543.59. *Id.* at ¶ 28. Furthermore, the Bank of New York Mellon is alleged, through counsel, to have submitted a letter in a New Jersey state court foreclosure proceeding stating that Plaintiff had complied with the TMA. *See* Complaint, Ex. B (Plaintiff "has completed all six of her trial modification payments and is going to be reviewed for a permanent modification").

The out-of-circuit, unreported decision in *Pennington* is again distinguishable, despite its holding that "[r]egardless of whether the TPP modifies a loan when a borrower meets his obligations, it does not modify a loan when he fails to meet the conditions the TPP specifies are necessary to obtain a modification." *Pennington,* 493 F. App'x at 551. The Fifth Circuit in *Pennington* found Defendant's acceptance of trial payments to be unpersuasive as proof of compliance because "[a]lthough the bank's acceptance of the trial payments from the Penningtons lends some support to finding that the parties intended to be bound, that weight is reduced, because the Penningtons already owed regular payments. Although the fact that they paid under the TPP indicates that they hoped to be bound, the question is whether the bank

17

expressed a similar intent despite the fact that conditions in the TPP remained unfulfilled. The bank deposited the payments, but the Penningtons owed more than that. Even if the bank intended to refuse to accept the TPP, it would still take the money in partial satisfaction of the amount owed while interest accrued." *Id.* at 555. The court's decision, however, turned on the fact that the TPP or TMA in that case required Defendant's signature for full execution. The Court found that in the absence of Defendant's signature, there was no allegation that Defendant intended to be bound by the TPP in the first instance. Thus, although acceptance of payments was consistent with the TPP being in force, it was equally consistent with Defendant simply partially collecting on the still defaulted loan. Here, by contrast, there is no term of the TMA requiring some action by Defendant for the TMA to go into effect.[8] As alleged, the TMA purports to give Plaintiff the power to accept the agreement through signature and performance, and Plaintiff has alleged that she did so. Coupled with Defendant's alleged acceptance of her performance, the Court finds sufficient allegations of compliance even without "certified funds," at least to survive a motion to dismiss.

As to the second point, Defendant's arguments concerning the untimeliness of Plaintiff's down and monthly payments raise questions of fact not properly before the Court on a motion to dismiss. Plaintiff alleges in her complaint that she paid the down payment and all six of her monthly trial payments on time, with on time payment being the fifteenth of the month. Compl. ¶ 24. Plaintiff further provides copies of five of the six monthly checks and the down payment check, all dated the fifteenth of their respective months. Defendant contends that the due date for

---

[8] It should be noted that the Court holds that no further action was required by Defendant for the TMA to become enforceable as an agreement. Whether or not the TMA included an enforceable promise for Defendant to provide a permanent modification is a separate question discussed, *infra*.

payments was not the fifteenth of the month, but the first, and that even if the due date were the fifteenth, Plaintiff's bank statement, attached to the Complaint, shows that the down payment, the June monthly payment and the August monthly payment were all "paid" late. Firstly, the meaning of "paid" is not alleged in the Complaint or explained in the attached documents, but, by common sense alone, in the absence of additional facts, the bank statements appear to show the date on which Defendant deposited Plaintiff's checks, rather than the date that they were transmitted by Plaintiff and received by Defendant. As such, the date of their deposit by Seneca would not be relevant to timeliness, so long as Defendant had received them on time. Secondly, the dispute about whether Plaintiff's representations and the dates on the check copies attached to the complaint, or Defendant's representations and the dates of Plaintiff's bank statements should govern, raise questions of credibility and comparative weight of the evidence that this Court is not permitted to adjudicate on these motions to dismiss.[9]

### C. Damages

Defendants further argue that Plaintiff has failed to allege any damages resulting from Defendants' alleged breach. As in the case of consideration, both Plaintiffs and Defendants focus their briefing primarily upon the question of whether the modified mortgage payments themselves can serve as adequate damages. Again, however, the Court need not decide that

---

[9] Defendant Seneca's reliance on *Arias v. Elite Mortgage Group* is also unpersuasive. There, the question was whether plaintiffs' "pattern of non-payment and inadequate payment which constituted a breach of the [trial modification] Agreement . . . justified the bank in refusing to give them a loan modification." 439 N.J. Super. 273, 281 (App. Div. 2015). Here, Defendant is alleged to have refused Plaintiff a permanent modification by failing to comply with its obligation under the TMA to review Plaintiff for one. The only allegations in the Complaint are that Defendant accepted Plaintiff's performance and then failed to perform, not, as in *Arias*, that Defendant performed its obligation to review Plaintiff's loan and rejected Plaintiff's performance at the time. Most importantly for the purpose of this motion to dismiss, the issue of the timeliness and compliance of Plaintiff's TMA payments in *Arias* was decided *on summary judgment*, after the development of the factual record. *Id.* at 279.

question because Plaintiff alleges other damages of a type broadly recognized by the courts in

the mortgage modification context.[10]

Specifically, in addition to the $32,543.59 in payments under the TMA, Compl. ¶ 73,

Plaintiff alleges, *inter alia*, that she was overbilled for interest owed on the loan, overbilled for

tax and insurance escrows owed on the loan, *id.* at ¶ 80(b), and suffered damage to her credit

score, *id.* at ¶ 111, loss of equity in her home, *id.* at ¶ 111, and economic loss associated with

counsel fees from defending against Defendants' allegedly erroneous collection actions *id.* at ¶

111. District courts in this circuit have routinely recognized these trial modification related

injuries as cognizable breach of contract damages.  *See Cave v. Saxon Mortg. Servs., Inc.*, No.

CIV.A. 12-5366, 2013 WL 1915660, at *7 (E.D. Pa. May 9, 2013) (finding damages where

plaintiff claimed "payment of increased interest, longer loan payoff times, higher princip[al]

balances, deterrence from seeking other remedies to address their default and/or unaffordable

mortgage payments, damage to their credit, additional income tax liability, [and] costs and

expenses incurred to prevent or fight foreclosure" and defendant "argue[d] that these damages

were not the result of its refusal to provide Plaintiffs with permanent modifications, [and] that

they would have arisen in any event because Plaintiffs' mortgages were in default"); *see id.* at *8

("The Complaint alleges that [defendant] did not provide Plaintiffs with permanent

modifications, and thus, their mortgage payments were never reduced and they never received

those other financial benefits that permanent modifications would have bestowed. . . . If

---

[10] Plaintiff erroneously cites *Smith v. CitiMortgage, Inc.*, 2015 U.S. Dist. LEXIS 171933, *14-15
(D.N.J. Dec. 22, 2015), for the proposition that trial modification payments alone can constitute
damages in the event of the breach of a trial modification agreement. The very passage of the
court's opinion in *Smith* to which Plaintiff cites however, makes clear that "[b]ecause the Court
finds that Plaintiffs have stated a claim for damages that are unrelated to the mortgage payments,
*it need not decide at this time whether the modified payments can be a basis for damages* given
the existing mortgage obligation." (emphasis added).

[defendant] had provided Plaintiffs with permanent modifications, it is reasonable to infer that they would not have incurred, *inter alia,* increased principal, interest, and longer loan payoff times that accrued after the end of their trial periods, and may have sought other remedies to address their unaffordable mortgage payments."); *Giordano v. Saxon Mortg. Servs., Inc.*, No. CIV.A. 12-7937 MAS, 2014 WL 4897190, at *7 (D.N.J. Sept. 30, 2014) ("as a result of [defendant's] breach, Plaintiffs suffer and continue to suffer damages, including increased interest payments, longer loan payoff times, deterrence from timely seeking other remedies, damage to their credit, additional income tax liability, and costs and expenses incurred to modify their loan. . . . Plaintiffs have sufficiently alleged damages resulting from [defendant's] breach."); *Sarlo v. Wells Fargo Bank, N.A.*, No. CIV. 12-5522 JBS/KMW, 2015 WL 1334038, at *14 n.7 (D.N.J. Mar. 24, 2015) (on summary judgment "[i]t would be premature to rule out the possibility of damages beyond [monetary] loss" where "Plaintiffs state that they have suffered 'adverse credit consequences' because of Defendant's breach," "Plaintiffs will need to submit additional evidence at trial to prove damages beyond that amount as a result of Defendant's failure to properly evaluate them for a loan modification."). *See also Wigod,* 673 F.3d at 575 (rejecting trial court's conclusion that plaintiff had not shown any pecuniary loss and pointing to the plaintiff's allegations that she "incurred costs and fees, lost other opportunities to save her home [and] suffered a negative impact to her credit."). I concur with the reasoning of these cases and find, accordingly, that Plaintiff has, on these motions to dismiss, adequately alleged damages arising from the claimed breach.

### D. Privity of Contract

Defendants further argue that, even were the TMA a binding contract, it could not be enforced against them because they are not in privity of contract with Plaintiff. "Generally, if a person has validly assigned all of his interest in a claim before an action is brought he is no

longer the real party in interest." *Beneficial Commercial Corp. v. Railserv Mgmt. Corp.*, 563 F. Supp. 114, 116 (E.D. Pa. 1983), *aff'd*, 729 F.2d 1445 (3d Cir. 1984). Seneca argues that any obligations it had related to Plaintiff's mortgage note were passed along with the mortgage servicing responsibilities to Ocwen. Ocwen and Fay, for their part, contend that the TMA binds, if any servicer, only Seneca, who was a party to the TMA, and did not pass with the mortgage because there never was a permanent modification. In short, each defendant claims that Plaintiff has no breach of contract cause of action against it, because, according to their assignment relationships, some other defendant bears exclusive contractual liability, if any.

Defendants' arguments concerning contractual privity, however, are misplaced in the context of motions to dismiss because the outcome turns on the factual nature of the assignments from Seneca to Ocwen and from Ocwen to Fay. Plaintiff has alleged that Defendant Seneca's alleged obligation under the TMA passed to Ocwen and from Ocwen to Fay along with the servicing responsibilities for Plaintiff's mortgage. Compl. ¶¶ 61, 65. Indeed, Plaintiff has attached a letter from counsel for the then creditor of Plaintiff's loan, Bank of New York Mellon, from December 2014, which suggests that, at the very least, the creditor holding Plaintiff's loan believed that the TMA had survived the assignment from Seneca to Ocwen. Compl. Ex. B.

Plaintiff also alleges that each of the three defendant servicers was bound by and breached the TMA. Compl. ¶¶ 52-71. This form of pleading in the alternative is permissible at this stage, as Plaintiff presumably does not have access to the assignment contracts governing the Defendants' relationships and therefore cannot know which of the defendants, if any, breached the TMA as a legal matter. Factually, however, Plaintiff has alleged that were each defendant liable under the TMA, each would have breached the agreement for failure to perform the required review of Plaintiff's loan for permanent modification. Seneca failed to review the loan

in the period from November 15, 2014 to December 1, 2014, during which time Seneca was

Plaintiff's loan servicer and Plaintiff had allegedly fully performed under the TMA. Ocwen

could be in breach in the period from December 2014 to March 2015, during which it was the

servicer of Plaintiff's loan and failed to review it for permanent modification, and Fay could be

in breach during the period after March 20, 2015, when it failed to so perform.

To require Plaintiff to allege additional facts about the assignment agreements between

Defendants, to which she does not have access without the benefit of discovery, would be unjust

and premature. The factual question of what the relationships were between Defendants, and

what obligations they incurred, must therefore be resolved on summary judgment or at trial. It

simply cannot be decided on a motion to dismiss upon the available pleadings.

### E. Defenses to Breach – Defendants Argue that the TMA Does Not Obligate Defendants to Provide Permanent Modification, Only Review, and Review is Discretionary (Illusory Contract)

Defendants also argue that Plaintiff fails to allege that Defendants breached the TMA,

because the TMA requires Seneca, or Defendants, only to "review" Plaintiff for a modification,

not award one. Further, Defendants argue that Seneca, or the other Defendants if the TMA is

binding on them, were entitled under the TMA to deny Plaintiff a permanent modification based

on "a material adverse change in [Plaintiff's] financial circumstances or any other change in

circumstances that render[ed] [Plaintiff] ineligible for a permanent modification." Because,

Defendants argue, Plaintiff has failed to allege that Seneca or another Defendant actually

conducted the review required by the TMA and concluded that Plaintiff's circumstances had not

changed, Plaintiff has failed to allege that Seneca or another Defendant breached the TMA. The

clear implication of Defendants' argument is that the existence of the TMA as a binding contract

was dependent upon a subsequent discretionary act by a Defendant, and thus in the absence of

any allegations that Defendants actually conducted the review of Plaintiff's mortgage required as

a condition precedent for Plaintiff to be entitled to a permanent modification, no breach has been alleged. I do not agree.

The Court in *Wigod* faced a similar but not identical TPP and argument from the defendant.[11] There, the TPP provided only that the defendant would review the plaintiff's eligibility for a modification at the time the TPP was offered and would offer a permanent modification provided that the plaintiff complied with the requirements of the TPP and her "representations . . . continue[d] to be true in all material respects." The defendant argued that it had the discretion to review the plaintiff's eligibility again after her compliance with the TPP terms before offering a permanent modification, in order to verify that the representations made at the time the TPP was offered continued to be true. The defendant contended that because its own discretionary action was required to trigger its obligations under the contract, there was no binding offer of a permanent modification, and, therefore, there was no breach. The Seventh Circuit rejected defendant's position:

> That is not a reasonable reading of the TPP. Certainly, when the promisor conditions a promise on *his own* future action or approval, there is no binding offer. But when the promise is conditioned on the performance of some act *by the promisee* or a third party, there can be a valid offer. See 1 Richard A. Lord, *Williston on Contracts* § 4:27 (4th ed. 2011) (hereinafter "*Williston on Contracts*") ("[A] condition of subsequent approval by the promisor in the promisor's sole discretion gives rise to no obligation.... However, the

---

[11] *See Wigod*, 673 F.3d at 561 (quoting 1 Joseph M. Perillo, *Corbin on Contracts* § 1.11, at 31 (rev. ed. 1993) (certain quotations omitted) "Wells Fargo contends that the TPP was not an enforceable offer to permanently modify Wigod's mortgage because it was conditioned on Wells Fargo's further review of her financial information to ensure she qualified under HAMP. Under contract law principles, when 'some further act of the purported offeror is necessary, the purported offeree has no power to create contractual relations, and there is as yet no operative offer.' Thus, a person can prevent his submission from being treated as an offer by [using] suitable language conditioning the formation of a contract on some further step, such as approval by corporate headquarters. Wells Fargo contends that the TPP did just that by making a permanent modification expressly contingent on the bank taking some later action.").

mere fact that an offer or agreement is subject to events not within the promisor's control ... will not render the agreement illusory.")

. . .

Wells Fargo's proposed reading of section 2 would nullify other express provisions of the TPP Agreement. Specifically, it would nullify Wells Fargo's obligation to "send [Wigod] a Modification Agreement" if she "compl[ied] with the requirements" of the TPP and if her "representations ... continue to be true in all material respects." TPP § 3. Under Wells Fargo's theory, it could simply refuse to send the Modification Agreement for any reason whatsoever—interest rates went up, the economy soured, it just didn't like Wigod—and there would still be no breach. Under this reading, a borrower who did all the TPP required of her would be entitled to a permanent modification only when the bank exercised its unbridled discretion to put a Modification Agreement in the mail. In short, Wells Fargo's interpretation of the qualifying language in section 2 turns an otherwise straightforward offer into an illusion.

The more natural interpretation is to read the provision as saying that no permanent modification *existed* "unless and until" Wigod (i) met all conditions, (ii) Wells Fargo executed the Modification Agreement, and (iii) the effective modification date passed. Before these conditions were met, the loan documents remained unmodified and in force, but under paragraph 1 and section 3 of the TPP, Wells Fargo still had an obligation to *offer* Wigod a permanent modification once she satisfied all her obligations under the agreement. This interpretation follows from the plain and ordinary meaning of the contract language stating that "the Plan is not a modification ... unless and until" the conditions precedent were fulfilled. TPP § 2.G. And, unlike Wells Fargo's reading, it gives full effect to all of the TPP's provisions. . . .Once Wells Fargo signed the TPP Agreement and returned it to Wigod, an objectively reasonable person would construe it as an offer to provide a permanent modification agreement if she fulfilled its conditions.

*Wigod*, 673 F.3d at 561-63.

The language of the TMA here is certainly more explicit than that in *Wigod*, in that Defendant Seneca was only bound to review Plaintiff for a permanent modification rather than award her one. Compl. Ex. A, Sec. 1, p. 2 ("Once you timely complete this payment schedule, you will be reviewed for a permanent modification. However, there is no guarantee that we will agree to permanently modify your Loan even if you make all trial payments"). Accordingly, Defendant initially appears to have reserved discretion to reevaluate Plaintiff's eligibility for the permanent modification, even after her compliance with the TPP. Importantly, however, as in

*Wigod*, Defendant limited its discretion by providing that Plaintiff would be awarded a permanent modification as long as Defendant's review uncovered no material change in her circumstances. *Id.* at Sec. 2, p.1 ("You will qualify for a permanent modification at the end of the trial period if (1) you timely make all trial payments; and (2) we conclude, after review, that there has not been a material adverse change in your financial status or any other change in circumstances that render you ineligible for a permanent modification."). This Court finds this requirement substantially similar to the requirement in *Wigod* that the plaintiff's representations underlying her eligibility for modification had to remain true in order for a permanent modification to be awarded.[12] Therefore, as in *Wigod*, Defendant was not empowered to deny Plaintiff a permanent modification for no reason, but only for the specific reason of a material change in circumstances. *See also Arias*, 439 N.J. Super. at 279 ("Based on our reading of the TPP Agreement, we conclude that it was 'a unilateral offer,' pursuant to which the bank promised to give plaintiffs a loan modification, *if and only if* plaintiffs complied fully and timely with their obligations under the TPP, including making all payments timely and providing documentation establishing that the financial representations they made to the bank in applying for the TPP were accurate when made and continued to be accurate.").

Accordingly, it is not a reasonable reading of the TMA to find, as Defendants suggest, that this provision gave Defendant unbridled discretion to deny Plaintiff a permanent modification for any reason, unrelated to her financial wherewithal, so as to make the existence of the TMA dependent upon Defendant's action and render the provision illusory. Defendant

---

[12] It is a simple matter of logic that the only way the servicer in *Wigod* would be able to determine that all of the financial information represented to them at the time the trial modification was offered remained true at the time of the debtor's complete performance would be to again review that information. The import of *Wigod* is that the subsequent review itself is not so discretionary as to vitiate the contract.

promised to provide a permanent modification if certain conditions were met by Plaintiff. Furthermore, Plaintiff has alleged in her Complaint that "[d]uring the Trial Modification Agreement payment period, Plaintiff did not experience a material adverse change in her financial status or any other change in circumstances that rendered Plaintiff ineligible for a permanent modification." Compl. ¶ 29. On this motion to dismiss, the Court must accept Plaintiff's allegation as true.

Lastly the Court again observes that "[w]hether or not [defendant] had an obligation to offer the permanent loan modification, and whether or not [defendant] performed in accordance with any alleged obligations, is a fact issue. Therefore, at [the motion to dismiss] stage of the proceedings, the Court will deny [defendant's] motion to dismiss . . ., without prejudice." *Laughlin v. Bank of Am., N.A.*, No. CIV.A. 13-4414, 2014 WL 2602260, at *8 (D.N.J. June 11, 2014).[13] *See also Sarlo*, 2015 WL 1334038, at *9 (Where there were allegations "that Defendant never bothered to conduct a proper evaluation for a loan modification, or that any final response was communicated to Plaintiffs," the court found that "[b]ased on this evidence, a reasonable jury could conclude that Defendant failed to properly assess whether Plaintiffs qualified for a loan with a lower interest rate and monthly payment, and breached its obligation to Plaintiffs.").[14]

---

[13] Even were it not an issue of fact, Defendants' argument that the TPP was effectively illusory would potentially face additional legal hurdles. *Arias*, 439 N.J. Super. at 277 (citing *N.J.S.A.* 56:8–1 to –195; *Gonzalez v. Wilshire Credit Corp.,* 207 *N.J.* 557, 576–78, 25 *A.*3d 1103 (2011) "While there are no reported New Jersey cases addressing the contractual status of a TPP Agreement, case law suggests that an agreement that purports to bind a debtor to make payments while leaving the mortgage company free to give her nothing in return might violate the New Jersey Consumer Fraud Act (CFA).").

[14] The Court is not persuaded otherwise by the cases cited by Defendants. *Stolba,* 2011 WL 3444078, at *3, is distinguishable because the contested document stated that Plaintiff only "may" have qualified *for a TPP*. Here, the complaint is clear that the TMA was fully executed.

**F.  Defenses to Breach – Defendants Argue that the TMA Does Not Obligate Defendants to Provide Review Within a Specific Time**

Defendant Ocwen contends that because the TMA is silent on the time for Defendants' performance of the obligation to review Plaintiff's loan for a permanent modification after Plaintiff's performance, Defendants had a reasonable time in which to do so, and no such reasonable time period elapsed before Seneca's transfer to Ocwen and Ocwen's transfer to Fay. "While a party's mere failure to perform within a contract's time deadline is not necessarily a material breach, the breach becomes material if that party fails to perform within a reasonable time." *Bapu Corp. v. Choice Hotels Int'l, Inc.*, No. 07CV5938(WJM), 2008 WL 2559306, at *4 (D.N.J. June 24, 2008) (citing  23 Richard A. Lord, *Williston on Contracts* § 63:18 (4th ed.1990)) *aff'd,* 371 F. App'x 306 (3d Cir. 2010).

The Court is skeptical whether the loan servicing transfers, which are brought about through multiple sales of Plaintiff's loan, could provide an excuse for non-compliance. At this juncture, the Court, however, merely declines Defendant Ocwen's invitation to find, as a matter of law, that the period of weeks and then months in which Defendants Seneca and Ocwen, respectively, had to perform on the TMA were necessarily insufficient to perform a review of

---

*Slimm,* 2013 WL 1867035 at *11, is likewise distinguishable because the cover letter sent to Plaintiff clearly stated that the TPP did not even purport to offer an obligatory permanent modification. Here, the language of the TMA clearly indicates that Plaintiff would be given a permanent modification, provided that certain conditions are met. See discussion in *Laughlin*, 2014 WL 2602260, at *7 ("In *Stolba,* the Court found that the plaintiffs could not plausibly state a breach of contract claim based upon their TPP. The Court, however, based this finding on the plain language of the TPP documents, which stressed that a borrower '*may* qualify for a HAMP TPP' and that a borrower would be offered a permanent loan modification '*If* we are able to modify your loan under the terms of the program ....' Likewise, in *Slimm,* the Court found that a cover letter sent to the plaintiffs indicated that the TPP did not create an individual obligation, but rather was only a part of the process towards achieving a permanent modification. . . . The problem with BANA's argument, however, is that it has failed to show that any such similar provisions exist in this TPP, and none are alleged by Plaintiffs in their Complaint.").

Plaintiff's loan such that performance by them should have been excused. The parties have not briefed the issue of what a reasonable time for compliance would have been, and, on its face, it is a fact-based inquiry, not appropriate on a motion to dismiss.

### G. Defense to Breach – Ocwen in Fact Provided Some Review

Lastly, Defendant Ocwen alleges that Plaintiff's allegations that Ocwen employee Adarsh informed Plaintiff that she would be receiving a permanent modification indicates that some review was undertaken, and accordingly, no breach of contract on that basis can be found. Defendant's argument, however, assumes numerous facts not in the pleadings, that, for example, Adarsh was in a position to bind Ocwen, Adarsh's representation that Plaintiff would receive a permanent modification was necessarily based upon some review, and that whatever review was undertaken was sufficient under the TMA and limited to the appropriate criteria set forth therein. In short, as with many of Defendants' previous arguments, the question of whether Plaintiff's loan was ever reviewed by any servicer is a question of fact not now before the Court. For now it is sufficient to observe that Plaintiff alleges that no such review took place, or, in the alternative, that if Adarsh did conduct such a review, no permanent modification was ever offered to Plaintiff, despite her continued qualification for modification under the TMA.

In finding these issues of fact, the Court is in accord with the most recent precedent on mortgage modifications in this District. *See, e.g. Hawkins v. Seterus, Inc.*, No. CV 16-1407 (KM), 2016 WL 5477995, at *4 (D.N.J. Sept. 27, 2016) ("Whether the TPP letter, which is subject to interpretation, was intended as such a binding offer, poses factual issues. Whether the borrower fully complied with its express and implied terms, and so on, remain issues as well. I cannot say, however, that the plaintiff's theory is so clearly foreclosed as a matter of New Jersey

law that his claim must be dismissed at the pleading stage. Further exploration of both the law

and the facts must await summary judgment.").

## II. Count II: FDCPA — Ocwen and Fay

While Plaintiff's claim for breach of contract is raised against all Defendants, the

remaining claims in the complaint are raised against select Defendants only. Plaintiff brings

FDCPA claims against Defendants Ocwen and Fay. Plaintiff alleges that Defendant Ocwen

violated 15 U.S.C. sections 1692d and 1692e on February 6, 2015, when Ocwen employee

Adarsh represented by phone that Ocwen would be sending a permanent loan modification

contract pursuant to the terms of the TMA, Compl. ¶ 79a; and separately violated section 1692e

by sending monthly loan statements to Plaintiff "demanding payment for a sum of money that

was not owed." Compl. ¶ 80b.

Ocwen moves to dismiss on the grounds that (i) neither the February phone call, nor the

transfer letter attached to the complaint are communications in connection with the collection of

a debt; (ii) that any FDCPA claim arising from the transfer letter attached to the complaint is

barred by the applicable statute of limitations; and (iii) that the February 6, 2015 phone call was

not abusive or harassing within the meaning of the Act.

The Fair Debt Collection Practices Act "is a consumer protection statute that prohibits

certain abusive, deceptive, and unfair debt collection practices." *Marx v. Gen. Revenue Corp.,* —

– U.S. ——, ——, 133 S.Ct. 1166, 1171 n. 1, 185 L.Ed.2d 242 (2013) (citing 15 U.S.C. § 1692).

By its terms, the purpose of the FDCPA is to "eliminate abusive debt collection practices by debt

collectors" while insuring that "debt collectors who refrain from using abusive debt collection

practices are not competitively disadvantaged." 15 U.S.C. § 1692. Relevant to the present matter,

the Act requires that within five days of the initial communication with a consumer in connection

with the collection of a debt, debt collectors must provide the consumer with written notice

containing certain information regarding the debt. 15 U.S.C. § 1692g. Additionally, the Act prohibits the use of any "false, deceptive, or misleading representations or means in connection with the collection of any debt." 15 U.S.C. § 1692e.

The statute creates a private right of action against debt collectors who fail to comply with its provisions. 15 U.S.C. § 1692k; *Marx,* 133 S. Ct. at 1171 n. 1; *Brown v. Card Serv. Ctr.,* 464 F.3d 450, 453 (3rd Cir. 2006). To state a claim under the FDCPA, a plaintiff must establish that "(1) he or she is a 'consumer' who is harmed by violations of the FDCPA; (2) the 'debt' arises out of a transaction entered into primarily for personal, family, or household purposes; (3) the defendant collecting the debt is a 'debt collector'; and (4) the defendant has violated, by act or omission, a provision of the FDCPA." *Grant v. JP Morgan Chase Bank,* No. 12–CV–06248, 2013 WL 1558773, at *2 (D.N.J. Apr. 10, 2013) (quoting *Berk v. J.P.Morgan Chase Bank, N.A.,* No. 11–CV–2715, 2011 WL 4467746, at *3 (E.D. Pa. Sept. 26, 2011) (citing 15 U.S.C. §§ 1692a-o)). Additionally, "[a] threshold requirement for application of the FDCPA is that the prohibited practices are used in an attempt to collect a 'debt'." *Zimmerman v. HBO Affiliate Grp.,* 834 F.2d 1163, 1167 (3rd Cir.1987).

Because the FDCPA is a remedial statute, the Third Circuit has construed its language broadly so as to give effect to its purpose. *Brown,* 464 F.3d at 453. Accordingly, courts analyze "any lender-debtor communications potentially giving rise to claims under the FDCPA" from the perspective of an objective "least sophisticated debtor." *Id.* at 454. The Third Circuit has expounded that the least sophisticated debtor standard "is lower than the standard of a reasonable debtor" such that "a communication that would not deceive or mislead a reasonable debtor might still deceive or mislead the least sophisticated debtor." *Rosenau v. Unifund Corp.,* 539 F.3d 218, 221 (3rd Cir. 2008) (internal quotations and citations omitted). Applying this standard gives

effect to "the basic purpose of the FDCPA: ... to protect all consumers, the gullible as well as the

shrewd, the trusting as well as the suspicious, from abusive debt collection practices." *Brown,*

464 F.3d at 454 (internal quotations and citations omitted). Nevertheless, "the standard does not

go so far as to provide solace to the willfully blind or non-observant." *Caprio v. Healthcare*

*Revenue Recovery Grp.,* 709 F.3d 142, 149 (3rd Cir. 2013) (quoting *Campuzano–Burgos v.*

*Midland Mgmt. Inc.,* 550 F.3d 294, 299 (3rd Cir. 2008)). In other words, although the least

sophisticated debtor standard is "less demanding than one that inquires whether a particular

communication subject to the FDCPA would mislead or deceive a reasonable debtor," the least

sophisticated debtor "is still held to a quotient of reasonableness, a basic level of understanding,

and a willingness to read with care." *Id.* at 149 (internal citations and quotations omitted).

Accordingly, the debt collector "cannot be held liable for bizarre or idiosyncratic

interpretations." *Id.* (citing *Wilson v. Quadramed Corp.,* 225 F.3d 350, 354–55 (3rd Cir. 2000)).

Indeed, the least sophisticated debtor is expected to read any collection notice in its entirety. *Id.*

(citing *Lesher v. Law Offices of Mitchell N. Kay,* 650 F.3d 993, 997 (3rd Cir. 2011)).

     Furthermore, the Third Circuit's FDCPA jurisprudence dictates that because the "least

sophisticated debtor" is an objective standard, the determination of how debt collection

communications would be perceived by the "least sophisticated debtor" is a matter of law, which

can be decided on a motion to dismiss. *See Wilson,* 225 F.3d at 353 n. 2; *Caprio,* 709 F.3d at

147; *see also Bodine v. First Nat'l Collection Bureau, Inc.,* No. 10–CV–2472, 2010 WL

5149847, at *2 (D.N.J. Dec. 13, 2010) (citing *Wilson,* 225 F.3d at 353 n. 2) ("The question of

whether a collection letter or notice violates the provisions of the FDCPA is a question of law to

be determined by the Court.").

### A. Claims Against Ocwen

As an initial matter, the Court observes that, in her complaint, Plaintiff alleges that the monthly account statements sent by Ocwen to Plaintiff were communications in violation of the FDCPA. Compl. ¶ 80(b). Defendant Ocwen seems to have interpreted this as referring to the transfer letter attached to the complaint in which Ocwen informed Plaintiff that servicing rights and responsibilities for Plaintiff's loan would be transferred to Fay, Compl. Ex. E, but the Court views the plain meaning of Plaintiff's allegations as encompassing account statements identified in, but not attached to the complaint, which Plaintiff alleges were sent monthly by Ocwen during its time as Plaintiff's mortgage servicer. In any event, Ocwen joins the arguments of the other defendants in their motions, and Defendant Fay clearly moves to dismiss on the basis of monthly account statements as well.

In relevant part, 15 U.S.C. § 1692d provides that:

A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt.

15 U.S.C. § 1692e provides that:

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section: (2) The false representation of—(A) the character, amount, or legal status of any debt.

Turning to Plaintiff's allegations against Ocwen, this Court cannot find that the February 6, 2015 phone call between Ocwen employee Adarsh and Plaintiff states the basis for a cause of action under the FDCPA. Firstly, it is not clear whether the call is properly considered a communication in connection with the collection of a debt. Plaintiff alleges merely that a conversation occurred, in which an Ocwen representative stated that a permanent modification would be sent. Although not clear from the pleadings, the general factual context of the complaint seems to suggest that the Ocwen representative made this representation after Plaintiff

33

or Plaintiff's counsel reached out to Ocwen to pursue Plaintiff's alleged contractual rights. Although it is not a categorical rule in the Third Circuit that a call initiated by the debtor cannot be a communication in connection with a debt, this Court is persuaded by the Third Circuit's favorable observation in dicta of the Sixth Circuit's holding in *Grden v. Leikin Ingber & Winters PC*, 643 F.3d 169, 173 (6th Cir. 2011). In *Simon v. FIA Card Servs., N.A.*, 732 F.3d 259, 266 (3d Cir. 2013), while addressing another issue of law, the Third Circuit commented favorably on *Grden*'s holding that "'for a communication to be in connection with the collection of a debt, an animating purpose of the communication must be to induce payment by the debtor.' *Id.* at 173 '[A] letter that is not itself a collection attempt, but that aims to make ... such an attempt more likely to succeed, is one that has the requisite connection.' *Id.* . . . The telephone call . . . did not give rise to an FDCPA claim because the debtor had initiated the call, and the statements by the person answering were 'merely a ministerial response to a debtor inquiry, rather than part of a strategy to make payment more likely.'"

Here, as in *Grden*, all that is alleged is that Plaintiff asked Ocwen's representative during a phone conversation to provide a permanent modification agreement, and the Ocwen representative agreed to send one. This communication, especially if initiated by Plaintiff, cannot be said to be seeking to induce Plaintiff to pay on her underlying or even modified debt and therefore is not a communication in connection with a debt as a matter of law. Accordingly, both Plaintiff's § 1692d and § 1692e claims on this basis are dismissed without prejudice.[15]

---

[15] As the failure to allege a communication in connection with a debt is sufficient to dismiss Plaintiff's § 1692d claim as well as Plaintiff's § 1692e claim on the basis of the February phone call, the Court need not reach the elements of a § 1692d claim. Plaintiff's allegations, however, are even more lacking concerning the claim for abuse and harassment as a result of the February 2015 conversation. There are no non-conclusory allegations about how Ocwen's representative's agreement to send a permanent modification agreement were at all harassing or abusive. As alleged, the conversation does not come close to approaching the level of abuse identified in the

The law of the Third Circuit concerning the monthly statements sent by Defendants, however, is much more favorable to Plaintiff. In *McLaughlin v. Phelan Hallinan & Schmieg, LLP*, the Third Circuit held that "a communication need not contain an explicit demand for payment to constitute debt collection activity. Indeed, communications that include discussions of the status of payment, offers of alternatives to default, and requests for financial information may be part of a dialogue to facilitate satisfaction of the debt and hence can constitute debt collection activity." 756 F.3d 240, 245–46 (3d Cir. 2014), *cert. denied*, 135 S. Ct. 487, 190 L. Ed. 2d 360 (2014). The Court extended this definition to documents, which, *inter alia*, "provide[] an invoice-like presentation of the amount due." *Id.* at 246.[16] *See also Simon*, 732 F.3d at 265–66 ("Nor can the [defendant's] FDCPA claims be dismissed on the ground that the letter and notice were not 'communications' under the statute. . . . We rejected [defendant's] argument and noted that a communication' need only convey information regarding a debt and is not limited to specific requests for payment." (citations omitted)); *Kaymark v. Bank of Am., N.A.*, 783 F.3d 168, 175 (3d Cir. 2015), *cert. denied sub nom. Udren Law Offices, P.C. v. Kaymark*, 136 S. Ct. 794, 193 L. Ed. 2d 710 (2016) (applying *McLaughlin* to find FDCPA applicability where a communication "plainly inform[ed] the reader of the specific amounts due for specific items as

---

non-exhaustive list provided by the statute. *See* 15 U.S.C. § 1692d ("(1) The use or threat of use of violence or other criminal means to harm the physical person, reputation, or property of any person; (2) The use of obscene or profane language or language the natural consequence of which is to abuse the hearer or reader; (3) The publication of a list of consumers who allegedly refuse to pay debts . . .; (4) The advertisement for sale of any debt to coerce payment of the debt; (5) Causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number; (6) . . . the placement of telephone calls without meaningful disclosure of the caller's identity.")

[16] *Ibid.* ("It is reasonable to infer that an entity that identifies itself as a debt collector, lays out the amount of the debt, and explains how to obtain current payoff quotes has engaged in a communication related to collecting a debt. Thus, the Letter constitutes debt collection activity under the FDCPA and misrepresentations contained therein may provide a basis for relief.").

of a particular date, . . . . [Defendant] also did not convey that the disputed fees were estimates or imprecise amounts. Thus, pursuant to *McLaughlin,* the Foreclosure Complaint conceivably misrepresented the amount of the debt owed, forming a basis for violations of § 1692e[].")

Plaintiff has alleged that she received monthly statements from Defendant Ocwen with erroneous information concerning the interest owed on her loan and the tax and insurance escrows on her loan, and providing information about the amount due on her loan. Under the Third Circuit's broad standard, these statements are therefore communications in connection with a debt as they provide information concerning Plaintiff's loan payments and seek to induce Plaintiff's payment thereof. The most recent court to address this question in this District found the same. In *Langley v. Statebridge Co., LLC*, "Defendant assert[ed] that the conduct that Plaintiff complainp[ed] about, the transmission of a monthly account statement, is not the type of activity that Congress sought to prevent when adopting the FDCPA." No. CIV.A. 14-6366 JLL, 2014 WL 7336787, at *2 (D.N.J. Dec. 22, 2014). The district court disagreed, finding that "[a] debt collection letter is deceptive where it can be reasonably read to have two or more different meanings, one of which is inaccurate. Here, Plaintiff has sufficiently alleged that the statements sent by Defendant violated the FDCPA by making false statements as to the amount owed upon the debt." *Langley*, 2014 WL 7336787, at *3 (quotation omitted). Similarly, accepting Plaintiff's allegations as true on this motion, this Court finds that Ocwen's monthly statements to Plaintiff are subject to the FDCPA. Plaintiff, however, will still need to prove any alleged misrepresentation on the merits.

### B.  Claims Against Fay

Plaintiff alleges that Defendant Fay violated section 1692(e) of the FDCPA by making false, deceptive, or misleading statements in (ii) the monthly statements and (ii) the notice of sale

of her loan that it sent to Plaintiff and violated § 1692c(a)[17] by the act of sending the monthly statements and notice of sale directly to Plaintiff despite knowing that Plaintiff was represented by counsel. At the outset, it is therefore important to note that Plaintiff's § 1692e claim is based upon *the content* of the monthly account statements and notice of sale transmitted by Defendant Fay. By contrast, Plaintiff's § 1692c(a) claim is based on *the very act of sending* the account statements and notice of sale to Plaintiff directly, as opposed to her counsel.

As analyzed above, the Court has held in the context of Ocwen's motion, that monthly statements can be subject to the FDCPA, and as Plaintiff raises the same allegations against Fay, I apply this decision to Fay as well.[18] Defendant Fay, however, presents an additional defense to Plaintiff's § 1692(e) claim based upon monthly statements and also responds to the § 1692(e) claim based on the notice of sale and the § 1692c(a) claim raised against it alone.

Firstly, Defendant Fay contends that it is not a debt collector within the meaning of the FDCPA, and therefore is not subject to liability under the statute. The FDCPA defines a debt collector as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." *Id.* § 1692a(6). However, that term does not include "any person collecting or

---

[17] 15 U.S.C. § 1692c(a) was erroneously identified as § 1692c(b) in the Complaint, but the parties have briefed the correct provision of the statute.

[18] The Court sees no contradiction or conflict in finding that the sending of statements required by TILA subjects loan servicers to the provisions of the FDCPA. Compliance with TILA merely subjects servicers to the reach of the FDCPA, it does not in and of itself, at least in the case of misleading statements, prove a violation. *Slimm*, 2013 WL 1867035, at *7 (citations omitted) ("Plaintiffs . . . nonetheless would need to satisfy the second prong of the FDCPA in order for it to be held liable under the Act—*i.e.,* to show that Bank of America engaged in 'prohibited practices' in an attempt to collect the debt. 'Prohibited practices' under the FDCPA include: the use of violence, obscenity, and profane language; repeated annoying phone calls; and false representations about the character, amount, or legal status of any debt.")

attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity ... concerns a debt which was not in default at the time it was obtained by such person." *Id.* § 1692a(6)(F). Therefore, the servicer of a residential mortgage loan is not a "debt collector" if the loan in question is not in default when acquired by the servicer. *See Siwulec v. Chase Home Fin., LLC,* 2010 WL 5071353, at *3 (D.N.J. Dec.7, 2010). *See also Slimm*, 2013 WL 1867035, at *7 (citations omitted) ("if Plaintiffs could show that Bank of America was a debt collector under the FDCPA because the loan was already in default when it was transferred."); *See also Beals*, 2011 WL 5415174, at *18 (quoting *Pollice v. Nat'l Tax Funding, L.P.,* 225 F.3d 379, 403 (3d Cir. 2000)) ("Pursuant to the words of the statute, courts have concluded that 'an assignee of an obligation is not a 'debt collector' if the obligation is not in default at the time of the assignment.' But 'an assignee may be deemed a 'debt collector' if the obligation is already in default when it is assigned.'").

In this case, the allegations in the complaint are insufficient to show that Defendant Fay was assigned Plaintiff's loan after it had gone into default, and was therefore a "debt collector" subject to the FDCPA. Specifically, Plaintiff alleges that as a result of financial hardship, she defaulted on her mortgage loan obligation in 2010. Compl. ¶ 16. Plaintiff, however, fails to allege that her mortgage remained in default at the time that Defendant Fay acquired the servicing rights on her loan on March 20, 2015. Compl. Ex. E. A more specific allegation to this effect is necessary, particularly in light Plaintiff's allegation that the foreclosure action against her was dismissed by way of stipulation on December 17, 2014, months before Fay is alleged to have assumed servicing responsibilities for the loan.[19] Compl. ¶ 37. It is simply not possible for

---

[19] The Court observes that the presence of active foreclosure litigation at the time of the December 1, 2014 transfer of servicing rights from Seneca to Ocwen is sufficient to state a claim that Ocwen acquired servicing rights to Plaintiff's debt while it was in default. Defendant

the Court to infer from the pleadings that Plaintiff did not become current on her mortgage in the intervening period, based upon Plaintiff's initial allegation of having gone into default in 2010 alone. As such, Plaintiff's FDCPA claim against Defendant Fay is dismissed without prejudice. Plaintiff, however, will be given leave to amend the complaint to clarify the status of her mortgage, *i.e.* whether it was in default or not, at the time it was transferred from Ocwen to Fay.

Having dismissed Plaintiff's FDCPA claims against Fay without prejudice, in the interest of judicial economy, the Court nevertheless proceeds to review those of Defendant Fay's other arguments with the potential to entitle Fay to a dismissal of claims with prejudice. Fay argues that monthly statements and notices of sale are not communications in connection with a debt subject to the FDCPA. As to monthly statements, as the Court held in the context of Ocwen's motion above, it appears that under the Third Circuit's post-*McLaughlin* precedents, monthly statements evidencing the amount of the debt and seeking to induce payment are communications in connection with the collection of a debt. The case of notices of sale, however, is more complicated. In a recent unreported case, the Third Circuit held that a notice of sale was not a communication in connection with a collection of a debt based on its specific text. *Vilinsky v. Phelan Hallinan & Diamond, PC*, 640 F. App'x 139, 142 (3d Cir. 2016) ("[plaintiff] points out that the letter notified him that the assignee of the mortgage may 'use and take all lawful ways and means for the recovery of all the said money and interest' and referenced the amount of the loan. We do not believe, however, that this can be classified as collection activity. Rather, [defendant] was merely identifying the affected mortgage and notifying [plaintiff] that the assignment gave [the assignee] all legal rights that had previously been assigned to [the previous

---

Ocwen, however, does not challenge its status as a debt collector under the FDCPA in the present motions.

loan holder].") Here, the Court has not been provided with the specific text of the notice of sale allegedly sent by Fay, and therefore cannot adjudicate on this motion to dismiss whether the notice of sale falls within the purview of the FDCPA.[20]

Turning next to Plaintiff's § 1692c(a) claim, Defendant Fay argues that Defendants should not be held liable under the FDCPA for sending directly to Plaintiff monthly statements that they are required to send by federal law. Specifically, a provision of the Truth in Lending Act (TILA), 15 U.S.C. § 1638(f), as implemented by 12 C.F.R. § 1026.41, requires that residential mortgage loan servicers transmit monthly statements to the "obligor" — the consumer. This Court agrees.

In the closely related context of consumers instructing debt collectors to cease communication altogether — as opposed to merely cease direct communication and contact the consumer's legal counsel as the Plaintiff alleges occurred in this case, the Consumer Financial Protection Bureau, which administers the FDCPA, responded to consistent uncertainty on the part of loan servicers subject to the mandatory statement provisions of the TILA by issuing a guidance letter that set forth, in relevant part, [1] "that the FDCPA 'cease communication' option does not generally make servicers that are debt collectors liable under the FDCPA if they comply with certain provisions of Regulation Z (... [including 12 C.F.R. §] 1026.41 (periodic statement))[;] ... [and] [2] that a servicer that is considered a debt collector under the FDCPA with respect to a borrower that provides disclosures to and communicates with the borrower pursuant to [12 C.F.R. § 1026.41] ..., notwithstanding a 'cease communication' instruction sent

---

[20] The only notice of sale attached to the complaint, that of Ocwen informing Plaintiff of the transfer to Fay, appears distinct from that found outside the FDCPA in *Vilinsky* because it clearly seeks to induce payment. Complaint, Ex. E ("Send all payments due on or after March 20, 2015 to Fay Servicing, LLC").

by the borrower, is not liable under the FDCPA." Implementation Guidance for Certain Mortgage Servicing Rules, 10152013 CFPBGUIDANCE, 2013 WL 9001249 (C.F.P.B. Oct. 15, 2013). The only court that this Court has identified to have evaluated the interaction of the FDCPA and TILA since the CFPB guidance, found that "plaintiff cannot state a claim under the FDCPA with respect to the periodic mortgage statements [the servicer] sent to plaintiff pursuant to federal law, *i.e.*, 12 C.F.R. § 1026.41." *Hill v. DLJ Mortg. Capital, Inc.*, No. 15CV3083, 2016 WL 5818540, at *8 (E.D.N.Y. Oct. 5, 2016). The Eastern District of New York reasoned that

> The CFPB determined, *inter alia*, that the servicing rule provisions requiring a servicer to provide borrowers with a periodic mortgage statement for each billing cycle under 12 C.F.R. § 1026.41 "are specifically mandated by the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) [Public Law 111-203, sec. 1420, 124 Stat. 1376 (2010)[13]], which makes no mention of their potential cessation under the FDCPA and presents a more recent and specific statement of legislative intent regarding th[o]se disclosures than does the FDCPA[,] ... [and] that th[o]se notices provide useful information to consumers regardless of their collections status."

*Id.* at *8 (quoting Implementation Guidance (C.F.P.B. Oct. 15, 2013)). The court in *Hill* was thus persuaded that the cessation provisions of the FDCPA should not be read to override or conflict with Congress's more specific and subsequent mandate in the Dodd Frank Act that servicers provide loan statements to consumers. This Court agrees. Defendant Fay was required by 15 U.S.C. section 1638(f), as implemented by 12 C.F.R. § 1026.41, to send Plaintiff monthly account statements detailing the status of her loan. Congress clearly did not intend compliance with its mandate, to send account statements to the consumer as opposed to the consumer's counsel, to automatically subject Defendants to liability under the FDCPA, § 1692c(a). Accordingly, Plaintiff's § 1692c(a) claim is dismissed.

Lastly, Defendant Fay alleges that Plaintiff has failed to plead fraud consistent with the requirements of Rule 9(b). "Rule 9(b) applies with equal force to fraud actions brought under federal statutes as to those actions that are based on state law but brought in federal court."

*Slimm*, 2013 WL 1867035, at *13  (citing *Frederico*, 507 F.3d at 200; *Christidis v. First Pa. Mortg. Tr.,* 717 F.2d 96, 99 (3d Cir. 1983)).

"[A]ny lender-debtor communications potentially giving rise to claims under the FDCPA should be analyzed from the perspective of the least sophisticated debtor." *Langley*, 2014 WL 7336787, at *3 (citing *Brown v. Card Serv. Ctr.,* 464 F.3d 450, 453–54 (3d Cir. 2006)). A debt collection letter is deceptive where "it can be reasonably read to have two or more different meanings, one of which is inaccurate." *Quadramed,* 225 F.3d at 354. Here, as in *Langley*, Plaintiff has "sufficiently alleged that the statements sent by Defendant violated the FDCPA by making false statements as to the amount owed upon the debt. . . . Accordingly, a court 'may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Langley* at *3 (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984)). At this point of the litigation, the Court finds that it is possible that relief could be granted consistent with Plaintiff's allegations. Therefore, Defendant's motion to dismiss Plaintiff's FDCPA claims for failure to allege fraud is denied.

Defendants do, however, successfully argue, and Plaintiff does not appear to contest, that 15 U.S.C. § 1692k(d) provides for a one year statute of limitations for any FDCPA claim. While Plaintiff has alleged that monthly statements were sent by both Ocwen and Fay within one year of the January 26, 2016 filing of the complaint, this Court holds that any communications or conduct occurring more than a year prior to the date of filing cannot serve as the basis for FDCPA claims.

In sum, Plaintiff's § 1692e claim based upon a telephone conversation alleged to have taken place with an Ocwen employee is dismissed without prejudice, Plaintiff's § 1692c(a) claim against Defendant Fay is dismissed with prejudice, and Plaintiff's FDCPA claims based on

conduct taking place before January 26, 2015 are dismissed with prejudice. As to all of Plaintiff's other FDCPA claims raised against Defendants Ocwen and Fay, Defendants' motions to dismiss are denied.

## III. Count III: RESPA

Plaintiff also brings a claim against Defendant Fay alone for violation of the Real Estate Settlement Procedures Act of 1974 (RESPA), 12 U.S.C. §§ 2601–2617. RESPA is "a consumer protection statute that regulates the real estate settlement process." *Jones v. ABN Amro Mortg. Grp., Inc.*, 606 F.3d 119, 124 (3d Cir. 2010). Congress enacted RESPA to "insure that customers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from...certain abusive practices." 12 U.S.C. § 2601(a). Originally under the umbrella of the Department of Housing and Urban Development, RESPA's rulemaking authority was transferred to the Consumer Financial Protection Bureau (CFPB) in 2010's Dodd–Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376. *See* 12 U.S.C. § 2617(a). These rules are codified at 12 C.F.R. pt. 1024 and collectively known as "Regulation X."

In 2013, the CFPB amended Regulation X to implement new rules governing mortgage servicing. *See generally* 78 Fed. Reg. 10,696 (Feb. 14, 2013) (effective Jan. 10, 2014). These new rules addressed servicers' obligations to (1) "establish reasonable policies and procedures to achieve certain delineated objectives"; (2) "provide information about mortgage loss mitigation options to delinquent borrowers"; (3) "establish policies and procedures for providing delinquent borrowers with continuity of contact with servicer personnel capable of performing certain functions"; and (4) "evaluate borrowers' applications for available loss mitigation options." 78 Fed. Reg. at 10,696.

12 C.F.R. 1024.5(a) applies RESPA to "federally related mortgage loans." 12 CFR § 1024.35(d) requires a servicer who receives a notice of error to acknowledge receipt of the notice of error within 5 days. §1024.35(e)(1)(i) provides that, generally, a servicer must respond to a notice of error by either:

> (A) Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or

> (B) Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

12 C.F.R. § 1024.35. § 1024.35(e)(3) requires, *inter alia*, in the situation at bar that the servicer undertake these responsive actions within thirty business days of the receipt of the notice of error.

Here, Plaintiff brings her RESPA claim solely under 12 C.F.R. § 1024.35. Plaintiff alleges that Defendant Fay received her Qualified Written Request and Notice of Error, dated July 27, 2015, on August 14, 2015. Compl. ¶ 88. Fay was therefore obligated under 12 CFR § 1024.35(d) to acknowledge receipt of the Plaintiff's notice within five business days [on or before August 21, 2015] and to undertake responsive action no later than thirty business days later [October 5, 2015].

Plaintiff alleges that Defendant Fay responded to Plaintiff's Qualified Written Request by letter dated September 11, 2015, but that Fay never acknowledged or responded to Plaintiff's Notice of Error. Compl. ¶¶ 92, 95. Plaintiff neither received notice of a correction of the alleged error, nor of an investigation into the alleged error. *Id.* at ¶ 98.

44

"[I]n order to bring a claim under RESPA, a plaintiff must sufficiently allege one of two types of damages: (1) actual damages to the borrower as a result of the failure to comply with § 2605; or (2) statutory damages in the case of a pattern or practice of noncompliance with the requirements of § 2605. Additionally, when basing a claim on actual damages, the borrower has the responsibility to present specific evidence to establish a causal link between the financing institution's violation and their injuries." *Giordano v. MGC Mortg., Inc*, 160 F. Supp. 3d 778, 781 (D.N.J. 2016). *See also Hutchinson v. Delaware Sav. Bank FSB,* 410 F.Supp.2d 374, 383 (D.N.J.2006) ("[A]lleging a breach of RESPA duties alone does not state a claim under RESPA. Plaintiffs must, at a minimum, also allege that the breach resulted in actual damages.") (citing 12 U.S.C. § 2605(f)(1)(A)).

Plaintiff alleges that she suffered actual damages as a result of Defendant Fay's purported RESPA violation, firstly, in the form of inflated monthly billing by Fay, Compl. ¶ 100, and, secondly, from time spent and expenses incurred in the preparation of the Notice of Error. *Id.* at ¶ 101. "A plaintiff seeking actual damages under § 2605 must allege that the damages were proximately caused by the defendant's violation of RESPA." *Kapsis*, 923 F. Supp. 2d at 445 (quotations and citation omitted). "Thus, to survive a motion to dismiss, the complaint must contain factual allegations suggesting that any damages plaintiff suffered were proximately caused by defendant's violations of § 2605, and conclusory allegations to that effect will not suffice." *Id.* at 445 (quotations, alterations and citation omitted). *See also Hill*, 2016 WL 5818540, at *10.

Defendant Fay moves to dismiss on the grounds that Plaintiff has failed to adequately plead actual damages. As to Plaintiff's claim of damages stemming from her legal costs in preparing the notice of error, the Court finds such allegations deficient as a matter of law. Stated

simply, Plaintiff's costs incurred in preparing the notice of error necessarily were incurred *before* any RESPA violation by Defendant Fay. "Courts that have directly considered the issue of pre-violation letter preparation costs have found that such costs are not actual damages under RESPA because RESPA requires the damages to flow as a result of the violation." *Giordano v. MGC Mortg., Inc*, 160 F. Supp. 3d 778, 782 (D.N.J. 2016) (collecting cases). RESPA contains an express requirement that damages accrue "as a result of the failure" to comply with the provisions of the Act. *See* 12 U.S.C. § 2605(f). Expenses that would be incurred regardless of a violation necessarily do not occur "as a result" of the violation. Second, this Court agrees with the reasoning of the district court in *Giordano* that "a finding that costs related to preparing and mailing the initial letter are actual damages under RESPA would make the actual damage pre-requisite to suit meaningless as there will always be some costs related to the initial letter." *Giordano v. MGC Mortg., Inc*, 160 F. Supp. 3d 778, 782 (D.N.J. 2016).

The Court also finds the Plaintiff's allegations of "inflated monthly billing" by Fay insufficient to plead actual damages. Defendant Fay argues that Plaintiff's RESPA claim must be dismissed because Plaintiff fails to plead that she in fact made any payments at the allegedly inflated rates after Defendant's alleged RESPA violation. Even construing all inferences in favor of the non-moving party, the Court cannot find that Plaintiff has adequately alleged that she in fact paid the inflated bills after Defendant's alleged RESPA violation and thereby suffered harm as a result of the overbilling. Compl. ¶¶ 83, 100.[21] Accordingly, Plaintiff's RESPA claim is dismissed, without prejudice.

---

[21] As observed above, however, the Plaintiff's payment history will be essential to any future summary judgment motion, as to the question of actual damages alleged elsewhere in the complaint. *See, e.g.*, Complaint ¶ 49 ("Plaintiff declined to make additional 'trial payments'" after July 2015).

**IV. Count IV: NJCFA**

Defendant Seneca contends that Plaintiff has failed to state an NJCFA claim in this case for three reasons. First, Seneca contends that Defendant has failed to plead an NJCFA claim with the requisite particularity to allege fraud. Second, Defendant alleges that Plaintiff failed to plead a causal connection between Defendant's alleged conduct and Plaintiff's ascertainable damages. And third, Defendant alleges that Plaintiff's CFA action is duplicative of and subsumed by Plaintiff's breach of contract action and cannot be raised separately as a matter of law. For the reasons set forth below Defendant Seneca's motion on these bases is denied.

The CFA "provides a private cause of action to consumers who are victimized by fraudulent practices in the marketplace." *Gonzales v. Wilshire Credit Corp.*, 207 N.J. 557, 576 (2011). To state a NJCFA claim, a consumer must plead (1) an unlawful practice; (2) an ascertainable loss; and (3) a causal relationship between the two. *Id.* at 577. The Act prohibits affirmative acts and knowing omissions that rise to deceptive trade practices, as well as violations of regulations adopted by the Division of Consumer Affairs made "in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance...." N.J.S.A 56:8-2.

There are three different categories of CFA violations: (1) "[a]n affirmative misrepresentation, even if unaccompanied by knowledge of its falsity or an intention to deceive"; (2) "[a]n omission or failure to disclose a material fact, if accompanied by knowledge and intent"; and (3) " 'violations of specific regulations promulgated under the [CFA],' " which are reviewed under strict liability. *Monogram Credit Card Bank of Ga. v. Tennesen*, 390 N.J. Super. 123, 133, 914 *A.*2d 847 (App. Div. 2007) (internal citations omitted). Unlawful conduct under the CFA is defined as: "use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretenses, false promise, misrepresentation, or the knowing,

concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J.S.A. 56:8-2. An unconscionable commercial practice "[n]ecessarily entails a lack of good faith, fair dealing, and honesty," and "[t]he capacity to mislead is the prime ingredient of all types of consumer fraud." Furthermore, "[m]ere consumer dissatisfaction does not constitute consumer fraud." *In re Van Holt*, 163 F.3d 161, 168 (3d Cir. 1998). In addition, "[t]he misrepresentation has to be one which is material to the transaction ... made to induce the buyer to make the purchase." *Gennari v. Weichert Co. Realtors,* 148 *N.J.* 582, 607, 691 *A.*2d 350 (1997).

"Rule 9(b) applies with equal force to fraud actions brought under federal statutes as to those actions that are based on state law but brought in federal court." *Slimm*, 2013 WL 1867035, at *13 (citing *Frederico,* 507 F.3d at 200; *Christidis,* 717 F.2d at 99). Courts dismiss NJCFA claims when "Plaintiff's claim for violations of the [NJCFA] does not explain with the required specificity or otherwise, the date, place or time of the allege fraud and/or who made the alleged representation." *Donnelly v. Option One Mortg. Corp.,* No. 11-cv-7019, 2013 WL 3336766 at *4 (D.N.J. July 1, 2013). Here, Plaintiff alleges that Seneca induced her to make trial modification payments and to sign the trial modification agreement, which as the Court observed above, included the forfeiture of valuable legal rights, and then failed to honor the trial modification agreement once Plaintiff had performed. The dates and communications involved in the alleged fraud are set forth in the complaint. The Court is mindful that Plaintiff's alleged fraud does not conform to the prototypical NJCFA action, but courts in this Circuit have held that misrepresentations regarding mortgage modifications fall within the NJCFA, since they are made

in connection with the "subsequent performance" of a mortage under the statute. *See, e.g.,*

*Laughlin*, 2014 WL 2602260, at *6 ("Considering the 'broad legislative intent evident from the

language and the policy goals of the [NJ]CFA,' it would be disingenuous to hold that a servicer

would be free from the ramifications of violating the NJCFA if it engaged in unlawful conduct

while participating in a loan modification. Just as fraud, deception, and other similar types of

conduct are not justified in forming a loan, so are they not permitted in attempts to modify a

loan. Therefore, a loan servicer's business practices during the loan modification process are

covered by the CFA." quoting *Lemelledo,* 150 N.J. at 264, 696 A.2d 546.); *Beals*, 2011 WL

5415174, at *17 (same); *Jubelt v. United N. Bankers, Ltd.*, No. CIV.A. 13-7150 ES, 2015 WL

3970227, at *5–6 (D.N.J. June 30, 2015) (same); *Sarlo*, 2015 WL 1334038, at *11-12 ("Despite

assuring Plaintiffs that it would have a decision within six to twelve weeks about a loan

modification under a more favorable interest rate, and despite accepting payment from Plaintiffs

for that loan modification, Defendant never properly evaluated Plaintiffs for a new loan under

the terms it had specified. . . . Under these facts, a reasonable jury could conclude that Defendant

offered to evaluate Plaintiffs for a loan modification within twelve weeks; that this statement

induced Plaintiffs to submit payment; and that Defendant failed to properly assess Plaintiffs as

they said they would do. Defendant could reasonably be found to have engaged in

misrepresentation under the NJCFA."). These same circumstances are pleaded by Plaintiff here.

With respect to the second prong-"ascertainable loss"-the plaintiff must "demonstrate a

loss attributable to conduct made unlawful by the [NJ]CFA," which is "quantifiable or

measurable," and not merely "hypothetical" or "speculative." *Thiedemann v. Mercedes—Benz*

*USA, LLC,* 183 N.J. 234, 246–52, 872 A.2d 783 (2005). However, plaintiffs "need not plead the

exact dollar amount of their loss. Instead, plaintiffs must provide enough specificity to give

defendants notice of their possible damages." *Giordano*, 2014 WL 4897190, at *6 (internal citation omitted). The damages for Plaintiff's NJCFA claim are the same as those set forth for the underlying breach of contract claim. It is plain that Defendants have been put on notice of Plaintiff's claimed damages. *See* Compl. ¶¶ 73, 111. In addition to the damages the Court has found Plaintiff has adequately asserted above, there is also some support in the NJCFA context for Plaintiff's theory of economic loss. *See id.* at *6 ("Plaintiffs have alleged ascertainable loss as either (1) the difference between money spent to obtain a permanent modification and the difference in value between their applied-for permanent modification and the value of the loan they have now, or (2) the difference in value between their applied-for permanent modification as of the Modification Date and the cost of payments they continued to make once the Modification Effective Date passed.").

Turning to Defendant Seneca's final argument, this Court agrees that just "any breach of contract . . . is not per se unfair or unconscionable and . . . alone does not violate a consumer protection statute." *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 18, 647 A.2d 454, 462 (1994) (citation omitted). As the New Jersey Supreme Court reasoned in *Cox*, "[b]ecause any breach of warranty or contract is unfair to the non-breaching party, the law permits that party to recoup remedial damages in an action on the contract; however, by providing that a court should treble those damages and should award attorneys' fees and costs, the Legislature must have intended that substantial aggravating circumstances be present in addition to the breach." New Jersey Supreme Court precedents since *Cox*, however, have made clear that in the special context of the mortgage loan modification process, NJCFA claims may be brought on the basis of an underlying breach of contract. In *Gonzalez*, the New Jersey Supreme Court concluded:

> We do not agree with defendants that the only option available to plaintiff in this case was to seek relief . . . in the chancery court or "to pursue common law claims such as

breach of contract and/or fraud." Defendants also argue that a number of federal and state statutes regulate the "mortgage lending and servicing" area, but insist that we declare that the CFA is not an available remedy. That we will not do. The CFA explicitly states that the "rights, remedies and prohibitions" under the Act are "in addition to and cumulative of any other right, remedy or prohibition accorded by the common law or statutes of this State." *N.J.S.A.* 56:8–2.13; *accord Lemelledo, supra,* 150 *N.J.* at 268, 696 *A.*2d 546.

207 N.J. at 584. In short, although Plaintiff's allegations state a claim for breach of contract, they may also support an NJCFA cause of action. Because the alleged breach in this case also involved a fraudulent inducement of Plaintiff to incur legal detriments, Defendant Seneca's motion to dismiss Plaintiff's NJCFA claim is denied.

## CONCLUSION

For the reasons stated above, Defendants' motions to dismiss are granted in part and denied in part as set forth in the Order to follow. All of Defendants' motions to dismiss Count I, Plaintiff's breach of contract claim, are denied; Defendant Ocwen's motion to dismiss Count II, Plaintiff's FDCPA claim, is granted in part and denied in part (granted as to Plaintiff's claim under section 1692d, granted as to Plaintiff's claim under section 1692e based upon the February 2013 telephone call with Ocwen's employee, granted on the basis of the statute of limitations for any conduct prior to January 26, 2015, and denied as to all other claims); Defendant Fay's motion to dismiss Count II, Plaintiff's FDCPA claim is granted (with prejudice as to Plaintiffs section 1692c(a) claim, without prejudice with respect to all other claims); Plaintiff is given leave to amend the complaint to address the status of Plaintiff's default at the time servicing responsibilities for her mortgage were transferred from Ocwen to Fay; Defendant Fay's motion to dismiss Count III, Plaintiff's RESPA claim, is granted; Defendant Seneca's motion to dismiss Count IV, Plaintiff's NJCFA claim, is denied.

Dated: _____10/31/2016_____                _____/s/ Freda L. Wolfson_____
                                            The Honorable Freda L. Wolfson
                                            United States District Judge